**LYNN & O'BRIEN, LLP**
Joshua E. Lynn, Esq. (SBN 182132)
lynn@lynn-obrien.com
Elizabeth A. O'Brien, Esq. (SBN 244697)
obrien@lynn-obrien.com
311 E. Carrillo Street, Suite A
Santa Barbara, CA 93101
Phone: (805) 845-5966
Fax: (805) 845-5902

Attorneys for Plaintiff Wendy Winslow,

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WENDY WINSLOW, an Individual,<br><br>          Plaintiff,<br><br>     v.<br><br>TARGET CORPORATION, VELOCITY PHARMA LLC, KILITCH HEALTHCARE INDIA LIMITED, and DOES 1-20, inclusive,<br><br>          Defendants. | Case No.  8:24-CV-02300<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**1. STRICT PRODUCTS LIABILITY- MANUFACTURING DEFECT**<br><br>**2. STRICT PRODUCTS LIABILITY- DESIGN DEFECT**<br><br>**3. STRICT PRODUCTS LIABILITY- FAILURE TO WARN**<br><br>**4. NEGLIGENCE**<br><br>**5. NEGLIGENT FAILURE TO WARN**<br><br>**6. NEGLIGENT FAILURE TO RECALL**<br><br>**7. BREACH OF IMPLIED WARRANTY**<br><br>**8. GROSS NEGLIGENCE**<br><br>**9. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br><br>**10. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |

1

)   **(UNLIMITED CIVIL CASE)**
)
)   **DEMAND FOR TRIAL**
)

COMES NOW Plaintiff WENDY WINSLOW ("Plaintiff"), for causes of action against Defendants TARGET CORPORATION, KILITCH HEALTHCARE INDIA LIMITED, VELOCITY PHARMA, and DOES 1-20, inclusive, based upon personal knowledge as to themselves, and on information and belief as to the conduct of all others, complains as follows:

## PARTIES

1.      Plaintiff Wendy Winslow ("Plaintiff") is a natural person who was, at all relevant times mentioned in this Complaint ("Complaint"), a resident of Rancho Santa Margarita, State of California.

2.      Defendant Target Corporation ("Defendant Target") is, and at all relevant times was, a publicly traded retailer that operates a chain of retail stores throughout the United States. Defendant Target has its headquarters at 1000 Nicollet Mall, Minneapolis, Minnesota.

3.      Defendant Target operates the Target store located at 30602 Santa Margarita Parkway, Rancho Santa Margarita, California, in this District where Plaintiff bought Up & UP Eye Drops that injured Plaintiff.

4.      Defendant Target manufactured and sold the UP & UP Dry Eye Relief Lubricant Eye Drops (15 mL), containing Carboxymethlcellulose Sodium 0.5%, (Lot No. 245090048 R01 C-001472) (National Drug Code 76168-800-15) that injured Plaintiff, including selling those eye drops in this District.

5.      At all relevant times, Defendant Target oversaw the promotion, and sale of the eye drops in this District and throughout the United States, including the eye drops that injured Plaintiff.

6.      The back of the bottle of the UP & UP Dry Eye Relief Lubricant Eye Drops (15 mL) used by Plaintiff, which injured her, said "Distributed by Target Corporation. Made in India."

7.      Defendant Velocity Pharma ("Defendant Velocity") is, and at all times relevant to this action was, a company incorporated under the laws of New York with its principal place of business

2

COMPLAINT

located at 210 Sea Lane, Farmingdale, New York.

8.    Defendant Velocity markets, advertises, labels, distributes, and sells the Target UP & UP Eye Drops product at issue in this litigation. This includes distributing the UP & UP Dry Eye Relief Lubricant Eye Drops and other eye drop products to Defendant Target's stores in the State of California, where Plaintiff purchased the product.

9.    Defendant Kilitch Healthcare India Limited ("Defendant Kilitch") is, and at all times relevant to this action was, a foreign corporation organized and existing under the laws of the Country of India, with its principal place of business at 37, Ujagar Industrial Estate, Mumbai, India.

10.    Defendant Kilitch manufactures, designs, tests, and distributes the eye drop solution product that Target sells as UP & UP Dry Eye Relief Lubricant Eye Drops (15 mL), the pharmaceutical product at issue in this litigation. Defendant Kilitch is a contract manufacturing organization used to manufacture ophthalmic drugs for Defendant Velocity.

11.    On information and belief, Defendant Target entered into a contractual agreement with Defendant Velocity related to the purchase of eye drops that were distributed by Defendant Velocity to wholesalers and retailers in the United States. The eye drops distributed by Defendant Velocity were manufactured by Defendant Kilitch. The eyedrops purchased by Defendant Target from Defendant Velocity were then resold in Target retail stores under the UP & UP brand name.

12.    Defendants DOES 1-20, inclusive, are sued herein under fictitious names because their true names and capacities whether individual, associate, corporate, governmental or otherwise are unknown to plaintiffs. Plaintiff will ask leave of this Court to amend this complaint to assert the true names and capacities of said Defendants when same are ascertained. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as DOE or named are negligently, carelessly, recklessly, strictly or otherwise responsible in some manner for the events and happenings herein referred to and caused damages directly and proximately thereby to Plaintiff.

13.    The Defendants are sued as principals or agents, servants, and employees of said principals and/or agents of each other and all of the acts performed as agents and employees were performed within the course and scope of their authority and employment and/or agency and with the consent of each of the Defendants.

14.    At all times mentioned herein Defendants engaged in the research, development,

3
COMPLAINT

manufacture, design, testing, packaging, labeling, sale, marketing, and/or the distribution of UP & UP Eye Drops that injured Plaintiff.

15.     Each Defendant received direct financial benefit from its activities and the sale of the product at issue in this lawsuit. Each Defendant was integral to the business enterprise such that Defendants' conduct was a necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

## VENUE AND JURISDICTION

16.     Venue is proper in this court pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different states. Plaintiff is a citizen of California and Defendant Target is a citizen of Minnesota. Defendant Velocity is a citizen of New York. Defendant Kilitch is a citizen of India.

17.     This Court has personal jurisdiction over each Defendant because, on information and belief, each Defendant conducts business in this state, has purposely availed itself of the laws of this state, and purposely directed its business to the state. Moreover, the injuries that are the subject of this lawsuit were caused by a product that was sold, distributed, delivered, used, and caused injury to the Plaintiff in Orange County.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. The conduct and events giving rise to the claims at issue occurred in Orange County. The Plaintiff resided in this county, the purchase and injuries occurred in the county, and relevant evidence and witnesses are believed to be located in the county.

## OPERATIVE FACTS
### Product Recall

19.     On October 27, 2023, the Federal Drug Administration (FDA) issued a warning to the public advising them to cease purchasing and to immediately stop using twenty-six (26) different varieties of over-the-counter eye drop products due to a potential risk of eye infections that could result in partial vision loss or blindness. Defendant Target's UP & UP Dry Eye Relief Eye Drops .5 fl oz were among those eye drops that were included in the FDA announcement. Defendant Target's UP & UP Dry Eye Relief Eye Drops were distributed to Defendant Target's stores from the United

States company Defendant Velocity who contracts Indian corporation, Defendant Kilitch, to manufacture pharmaceutical products including the subject eye drops.

20.     In its recall warning to Defendant Kilitch, the FDA recommended that all retailers remove the infected eye drops from their store shelves. This came after the FDA concluded an investigation into Defendant Kilitch's Mumbai plant on October 25, 2023, after agency investigators found unsanitary conditions in the manufacturing facility and received positive bacterial test results from environmental sampling of critical drug areas in the facility. Subsequently, the FDA advised all manufacturers of the eye drop products to recall all of their lots.

21.     Despite the FDA's immediate notice on October 25, 2023, neither Defendants Target, Kilitch, or Velocity issued a recall decision after being informed of the bacterial presence in the eye drop products. The delay resulted in the FDA issuing its own public notice two days after its notification to Defendant Kilitch and Defendant Velocity on October 27, 2023.

22.     On November 15, 2023, Defendant Kilitch at last issued a voluntary recall, almost three weeks after the FDA issued theirs. Even though the FDA does not have the legal authority to mandate manufacturers recall their products, Defendant Kilitch was aware and knew about the potential exposures to bacterial infections prior to November 15, 2023 as FDA investigators preliminarily found in their report insanitary conditions at Defendant Kilitch's Mumbai plant on October 25, 2023 The FDA's preliminary report documented plant workers avoiding safety precautions and working without masks, gloves, and/or gowns and in some areas of the plant, the workers were barefoot in what should have been sterilized stations. The FDA also found that the facility was dilapidated citing cracked floors, water stains, and peeling paint around the facility. [1]

23.     The FDA's report also suggested that factory managers and overseers ignored, omitted, and/or falsified contamination test results of the eye drops. These tests would indicate the presence of potentially harmful bacteria and send out an alert or action limit if they were found. Most of the time, plant officials would not document the alert and instead remand the product to the workers for additional cleaning to produce and record a lower reading of the bacteria that indicated that the products were sterile.

24.     Defendant Velocity is an intermediary that connects wholesalers, like Defendant Kilitch, to Defendant Target. On July 17, 2024, the FDA issued a warning letter to Defendant Velocity regarding its inspection of Defendant Kilitch's manufacturing facility and another contract manufacturing organization. The FDA conducted an investigation from November 3, 2023, to

[1] https://apnews.com/article/eyedrops-recall-fda-warning-india-11624105e31a68102d414594c85766f0

COMPLAINT

December 14, 2023, after the initial inspection of Defendant Kilitch's manufacturing plant.

25.    Defendant Velocity engaged in interstate commerce of adulterated drugs, and the delivery or proffered delivery thereof, and was found by the FDA to be in violation of the Federal Food, Drug, and Cosmetic Act ("FD&C") § 301(c), 21 U.S.C. 331(c) and their introduction into interstate commerce of adulterated drugs violates the FD&C Act § 301(a), 21 U.S.C. 331 (a). Adulterated drugs, under the FD&C Act §§ 501(a)(2)(A) and 501(a)(2)(B), means:

> A drug (including a drug contained in a medicated feed) shall be deemed to be adulterated if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirement of the act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.

As stated in the FDA's warning letter, Defendant Velocity "failed to have adequate procedures to ensure all ophthalmic drug products produced for your firm met appropriate quality attributes. [Velocity] also failed to have adequate supplier qualification procedures to ensure that the drug products received from Kilitch and [redacted] were manufactured in compliance with [Current Good Manufacturing Practice (CGMP)] prior to being distributed in the United States."[2] Further, the FDA warned Defendant Velocity that its record for distribution of pharmaceuticals were deficient citing that, upon inspection of Defendant's Velocity's facility, distribution records "were missing addresses, batch numbers, and quantities shipped from [Velocity's] facility."

26.    Defendant Velocity knew of the egregious conditions of Defendant Kilitch's facility and the potential for the bacteria present in the eye drop products that could cause vision loss or blindness. Defendant Velocity failed to remove the eye drop products from retailers across the United States including its own Velocity Pharma labeled products. Defendant Velocity has a duty as a United States located pharmaceutical distributor to strictly adhere to the FDA's guidelines regarding CGMP. It failed to investigate the quality of the products it produces across the United States in major retailers such as Defendant Target and in doing so violated FD&C Act §§ 301(a) and 301(c).

27.    Because of Defendant Kilitch's failure to use and employ proper safety, sterilization,

_____

[2] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/velocity-pharma-llc-676434-07172024

COMPLAINT

and caution protocol and failure to record, report, and distribute appropriate, accurate, and unaltered product reports, it allowed its pharmaceutical eye drop solution to be sold by contract to Defendant Velocity. Likewise, because of Defendant Velocity's failure to adequately inspect the quality of product from its manufacturer Defendant Kilitch, the eye drop product subject to this lawsuit was able to be sold at retailers across the United States including Defendant Target's Rancho Santa Margarita retail store in Orange County, California under Defendant Target's own product label UP & UP. The same eye drop product has now been found to contain the antibiotic-resistant bacteria by the name of *Pseudomonas fluorescens*. This bacterium is extremely drug resistant, dangerous, and can result in vision loss, eye loss, serious health conditions and death.

### Plaintiff's Purchase of the Adulterated Eye Drops and Injuries

28.     On November 14, 2022, Plaintiff purchased Defendant Target's UP & UP Dry Eye Relief Lubricant Eye Drops from Defendant Target's Rancho Santa Margarita store. Plaintiff had previously regularly purchased and used various different kinds of Defendant Target's eye drops and had never experienced any issues with the quality of the eye drops or any negative effects from use of the product. She went on to purchase Defendant Target's UP & UP Dry Eye Relief Lubricant Eye Drops an additional time on July 19, 2023, in Mission Viejo, CA in Orange County. Plaintiff additionally purchased UP & UP Allergy eye drops on November 4, 2023, in Oceanside, CA in San Diego County where she now resides.

29.     Plaintiff uses eye drops regularly and has bottles located in her purse, salon, at home, and in her car for convenient use when her eyes start to feel dry or irritated.  At the end of summer into fall 2023, Plaintiff's eyes began to gradually feel more and more dry and irritated so she used the eye drops even more frequently in order to combat these effects. Still, Plaintiff did not suspect that the eye drops themselves caused her to experience the dryness and irritation.

30.     On October 17, 2023, Plaintiff had a previously scheduled appointment with her dermatologist, Dr. Jacqueline Levin, DO, at West Dermatology in Rancho Santa Margarita.  During this appointment, Plaintiff informed Dr. Levin that she had a small stye forming  on her right eyelid which Dr. Levin subsequently prescribed her an oral antibiotic, Doxycycline 100 mgs, for. At this time, Dr. Levin did not seem to connect the stye to the eye drops at issue. Therefore, Plaintiff took the prescribed antibiotics and, out of an abundance of caution, discarded all of her makeup in case the makeup was causing her to develop the stye, bought all new makeup, and waited for the stye to heal.

COMPLAINT

31.     While Plaintiff was taking the Doxycycline, which she was prescribed to take for one week, Plaintiff noticed another stye forming on her left eyelid.  It seemed that her symptoms were worsening as she also began to experience burning and itching in both eyelids.  Over the following days, Plaintiff's vision gradually became increasingly impacted to the point that her eyes were constantly causing her discomfort. The only time she was able to experience any relief from her symptoms was when her eyes were closed. Plaintiff finished the Doxycycline on October 24, 2023.

32.     After another week passed, Plaintiff did not experience relief from her symptoms; in fact, they proceeded to worsen. By late October 2023, Plaintiff could no longer wear makeup as it caused her extreme discomfort due to her eyes constantly watering. She began to fear that her symptoms were a result of something far worse; however, she was suspect that her symptoms were a result of allergies, so she purchased Defendant Target's UP & UP Four-Hour Allergy Eye Drops on November 4, 2023. At the same time, during her forty (40) minute commutes to work from Oceanside, CA in San Diego County to her salon in Rancho Santa Margarita, her eyes began to water and burn so much so that she would have to pull over two to three (2-3) times each morning as she could not see while driving down busy freeways.

33.     On November 9, 2023, at 11:00 am, Plaintiff received an automated voicemail from Target Guest Relations informing her that an individual associated with her phone number had purchased UP & UP Dry Eye Relief Lubricant Eye Drops from Target that were now effectively being recalled. Originally, Plaintiff did not listen to the aforementioned voicemail from Target Guest Relations until later on November 14, 2023, as she believed the call was a spam message.

34.     The following day, on November 15, 2023, Plaintiff went to urgent care as soon as she awoke to have her eyes evaluated since she was still in substantial and extreme pain from her symptoms. Plaintiff was seen by a Physician's Assistant, Ryan Pham PA-C, at Marque Urgent Care in Rancho Santa Margarita, CA.  There, she immediately underwent testing and lab work to discover the root of her symptoms. After the Physician's Assistant reviewed her labs, he informed her that she had a massive bacterial infection in both of her eyes which necessitated antibiotics.  He then prescribed her an oral antibiotic, Cephalexin 500 mgs, along with a very thick nightly ointment, Erythromycin 3.5 gm, to apply to both of her eyes for two weeks.

35.     On November 22, 2023, Plaintiff's prescription ended. A week and a half later, Plaintiff's symptoms and infection continued to worsen despite taking the Cephalexin daily and applying the Erythromycin nightly. While still experiencing harsher symptoms, Plaintiff continued to attempt her regular job as a hairdresser. Plaintiff's primary means of work is to dye her client's

COMPLAINT

hair, however, suddenly her eyes began to sting and become increasingly swollen whenever she uses dying products. Even after she was done coloring and cutting her client's hair, her eyes continued to burn.

36.     Despite finishing this round of antibiotics, the infection persisted which prompted Plaintiff to call Marque Urgent Care, the urgent care that she had previously visited, to request more antibiotics. They declined her request and recommended that she go to the Emergency Room, because it was irregular and strange that she was not getting better after taking the prescribed antibiotics.

37.     On December 6, 2023, Plaintiff took another morning off work to make an urgent appointment with her ophthalmologist, Dr. Shahrzad Yazdan, D.O. at Lens Crafters located in Rancho Santa Margarita. Dr. Yazdan gave Plaintiff a thorough eye examination and found that the bacterial infection had made its way into Plaintiff's cornea. Dr. Yazdan prescribed Plaintiff  another round of oral antibiotics, along with steroid eye drops, Neo-Poly Dex Eye Drops, and  was instructed to clean her eyes every hour with medicated eye lid wipes, use the provided steroid eye drops three (3) times a day, apply a heat mask to her eyes three (3) times a day for thirty (30) minutes, and to come back to the ophthalmologist in ten (10) days to check on the progress of the antibiotics and see if her symptoms and infection were getting better.

38.     Plaintiff followed the directions she was given by her ophthalmologist, and maintained the strict regimen of antibiotics, heat compresses, eye lid wipes, and eye drops. On December 16, 2023, Plaintiff took the afternoon off from work to return to Dr. Yazdan's office for a follow-up appointment. Dr. Yazdan conducted another eye exam and she informed Plaintiff that while the infection in her eyes was not getting worse, it was also not getting better. She advised Plaintiff to follow up with her in another ten (10) days and continue with her prescribed regimen.

39.     In the days that followed, Plaintiff began to do her own research on the recalled UP & UP Dry Eye Relief Lubricant Eye Drops. She found that Defendant Kilitch was the operation responsible for the bacterial presence in the eye drops. Plaintiff subsequently went to Defendant Kilitch's website and filled out an "Adverse Event Report Form" and submitted it on December 25, 2023, to the email indicated on the form: regulatory@kilitchhealthcare.com. To date, Defendant Kilitch has not responded to her form.

40.     On December 27, 2023, Plaintiff returned to Lens Crafters to see Dr. Yazdan for a follow up.  Dr. Yazdan prescribed Plaintiff with another round of Cephalexin 500 mgs to take for one week. She then advised Plaintiff to contact her office once the prescription duration ended if the

COMPLAINT

infection and subsequent symptoms and pain did not clear up and heal because she would then need to refer Plaintiff to an infectious disease specialist as there was unfortunately nothing more she could do to treat Plaintiff.

41.     On the recommendation of two of Plaintiff's clients, Plaintiff made the first available appointment with an eye specialist, Dr. Audrey Tai D.O., M.S. in Mission Viejo, CA, for February 1, 2024.  Dr. Tai did a thorough eye exam and dilated Plaintiff's eyes. When Dr. Tai completed her comprehensive inspection of Plaintiff's eyes, she explained that the bacteria was causing Plaintiff's styes and her eyelids to produce excessive oil causing the natural hydration in her eyelids to dry out, subsequently causing Plaintiff's eyesight to be blurry and in constant, excruciating pain.

42.     Dr. Tai prescribed Plaintiff another round of oral antibiotics to be taken for thirty (30) days as well as a tea tree eyelid wash and tea tree eyelid wipes to help combat the infection and the excessive oil production in Plaintiff's eyelids. She was instructed to also continue the regimen of applying a heat mask to her eyes two (2) times a day for thirty (30) days and scheduled a follow-up appointment with Dr. Tai for February 29, 2024.

43.     Plaintiff followed Dr. Tai's instructions, took the prescribed oral antibiotics, used the tea tree eyelid wash and the tea tree eyelid wipes, and applied a heat mask to her eyes two (2) times a day, however, two (2) weeks into this regimen, another stye formed on Plaintiff's left eye. Plaintiff's eyes thereafter continued to excruciatingly burn, hurt, and tire easily.

44.     On or about March 8, 2024, Plaintiff visited Harvard Eye Associates in Laguna Hills, CA and was seen by Dr. Jeffrey Jacobs. There, a sample specimen was taken from the now recalled bottle of eyedrops and sent to Quest Diagnostics to identify the bacterium infection in her eyes. After a week, on March 15, 2024, the labs from the specimen came back and showed that it contained *Pseudomonas fluorescens*.

45.     On April 4, 2024, Plaintiff returned to Harvard Eye Associates in Laguna Hills for a follow up appointment with Dr. Jacobs. There she presented swollen eyelids with redness, light sensitivity, and itchy and blurred vision. Dr. Jacobs prescribed Ciproflaxin 500 mg because it is only one of six known antibiotics that could kill the *Pseudomonas fluorescens* bacteria. While using this antibiotic, Plaintiff had to be sure and not physically exert herself because the antibiotic is so powerful it can cause the user's tendons to rip off of their bones.

46.     Plaintiff's eyes have continued to cause her pain and injury and have affected both her work and in her personal life. In between July 2024 and the beginning of August 2024, Plaintiff went to urgent care twice within a three-week period due to waking up with swollen and inflamed eyelids.

COMPLAINT

Plaintiff was treated with Prednisone for five (5) days upon her first urgent care visit. After a week or two, Plaintiff again woke up on August 1, 2024, with her eyes swollen completely shut. Plaintiff went to urgent care again and was put on another course of Prednisone and given a steroid ointment. At the urgent care visit, the attending doctor recommended that Plaintiff wear goggles when doing any sort of hairdressing coloring services going forward, which would cause extreme inconvenience and hassle to Plaintiff. During both of these urgent care visits, Plaintiff had to call out of work due to her appearance and poor vision; her eyes were extremely swollen, puffy, inflamed, red, and painful.

47.     On September 10, 2024, Plaintiff made an appointment with allergist Dr. Janet B. Kim at Janet B. Kim, M.D., Inc. in Mission Viejo, CA. At this appointment, Dr. Kim reviewed Plaintiff's symptoms and did a physical examination of her eyes. After review, Dr. Kim diagnosed Plaintiff with Angioedema and prescribed Plaintiff an EPIPEN to have with her at all times in the case that Plaintiff has a flare up of symptoms resulting in closure of Plaintiff's airway. Dr. Kim also discussed with Plaintiff the possibility that the bacterial infection could worsen and eventually travel to Plaintiff's ears, throat, and nose.

48.     On October 3, 2024, Plaintiff woke up with such swelling in and around her eyes she could barely open them. She immediately went to the Emergency Room where she spent the entire day. The emergency room doctors ran a variety of tests, performed a CT scan and a chest x-ray, and administered steroids to calm the inflammation. After labs and tests were conducted, the emergency room doctors determined that Plaintiff had a diagnosis of either Lupus or Dermatomyositis, or potentially both, localized in Plaintiff's eyes as a result of bacterial infection. They informed her that at her next follow up appointment they would provide a specific diagnosis.

49.     Plaintiff has had to make the difficult decision to close her salon as she is too disabled to continue to perform work as a hair stylist. She is in constant pain and has lost significant enjoyment of life and suffers immense physical pain and suffering, and mental anguish and stress.

## GENERAL ALLEGATIONS

50.     Defendants negligently or recklessly placed the contaminated and potentially contaminated eye drops into the stream of commerce, exposing thousands of people to substantial risk of bacterial infection, vision loss, serious illness, and/or death. All Defendants' misconduct offended public policy, presented a substantial and unjustifiable risk of injury to consumers, and provided no countervailing benefit to consumers, considering the severe risk of personal injury and/or death.

COMPLAINT

51.    The eye drops at issue did not disclose that they were contaminated and provided no warnings or instructions regarding the risk of bacterial contamination, the signs of, and what to do if a user suspected an infection.

52.    When Plaintiff purchased and used the eye drops at issue, Plaintiff reviewed the product labeling and instructions and relied on Defendant Target's representations and omissions about the eye drops, including representations that the products provide "fast symptom relief" and would "relieve dry and irritated eyes". At no point did Plaintiff believe that the product labeling or instructions were inadequate.

53.    Plaintiff reasonably relied on Defendants to sell products that are safe and free from harmful known substances, and to promptly and clearly inform and warn about the dangers of the eye drops at issue.

54.    Plaintiff would not have purchased and used the eye drops at issue, and Plaintiff would not have suffered physical injuries had Defendants disclosed the risk that the eye drops were contaminated with dangerous bacteria. Consequently, Plaintiff suffered injuries due to the Defendants' dangerous conduct.

55.    Based on Defendants' misconduct, Plaintiff brings claims against Defendants for: (1) Strict Products Liability - Manufacturing Defect; (2) Strict Products Liability - Design Defect; (3) Strict Products Liability - Failure to Warn; (4) Negligence; (5) Negligent Failure to Warn; (6) Negligent Failure to Recall; (7) Implied Breach of Warranty; (8) Gross Negligence; (9) Negligent Infliction of Emotional Distress; and (10) Intentional Infliction of Emotional Distress.

**I.**
**FIRST CAUSE OF ACTION**
**(Strict Products Liability – Manufacturing Defect – against all Defendants)**

56.    Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

57.    Defendants are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Lubricant Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; Defendant Velocity were apparent distributors who packaged, labeled, marketed, advertised, supplied, distributed, and sold the product; and Defendant Target marketed, advertised, distributed, and sold the product.

12
COMPLAINT

58.     Each Defendant received direct financial benefit from its activities and the sale of the product at issue. Each Defendant was integral to the business enterprise such that Defendants' conduct was a substantial and/or necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

59.     The product was defective in that it was contaminated with *Pseudomonas fluorescens*. Due to the contamination, it differed from the manufacturer's intended design or specifications or from other typical units of the same product line. The product was defective when it left Defendants' possession. Plaintiff used Target UP & UP Dry Eye Relief Lubricant Eye Drops in a reasonably foreseeable manner. Plaintiff suffered harm, and the defect in the product was a substantial factor in causing that harm.

60.     On information and belief, certain Defendants acted with malice, oppression, or fraud-including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example, including but not limited to: Defendants failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations. Those Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

## II.
## SECOND CAUSE OF ACTION
### (Strict Products Liability – Design Defect – against all Defendants)

61.     Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

62.     Defendants are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Lubricant Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; Defendant Velocity were apparent distributors who packaged, labeled, marketed, advertised, supplied, distributed, and sold the product; and Defendant Target marketed, advertised,  and sold the product. Each Defendant received direct financial benefit from its activities and the sale of the product at issue. Each Defendant was integral to the business enterprise such that Defendants' conduct was a substantial and/or necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

13

COMPLAINT

63.     The product's design was defective because it enabled the product to be contaminated with *Pseudomonas fluorescens* and thus, did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way. Alternatively, the design was defective because it enabled the product to be contaminated with *Pseudomonas fluorescens* and the risks associated with the product's design outweighed its benefits. Plaintiff was harmed, the product's design or failure to perform safely was a substantial factor in causing the harm suffered by Plaintiff.

64.     On information and belief, certain Defendants acted with malice, oppression, or fraud - including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example, including, but not limited to: Defendants failed to implement protocols to ensure that the product was safe and sterile while simultaneously representing that the product was safe and in compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

## III.
## <u>THIRD CAUSE OF ACTION</u>
### (Strict Products Liability – Failure to Warn – against all Defendants)

65.     Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

66.     Defendants are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Lubricant Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; Defendant Velocity is an apparent distributor who packaged, labeled, marketed, advertised, supplied, distributed, and sold the product; and Defendant Target marketed, advertised, and sold the product. Each Defendant received direct financial benefit from its activities and the sale of the product at issue. Each Defendant was integral to the business enterprise such that Defendants' conduct was a substantial and/or necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

67.     The product had potential risks, side effects, or adverse reactions that were known or knowable in light of the scientific and/or medical knowledge at the time of the product's manufacture, distribution, packaging, labeling, supplying, marketing, advertising, and/or selling - for example, that

it may be contaminated with a potentially deadly bacterium. The potential risks, side effects, and/or adverse reactions presented a substantial danger when the product was used or misused in an intended or reasonably foreseeable way. Ordinary consumers would not have recognized the potential risks, side effects, or adverse reactions. Defendants had a duty to warn and to continually update warnings. Defendants failed to adequately warn, instruct, or update the potential risks, side effects, or adverse reactions. Plaintiff was harmed, the lack of sufficient instructions or warnings was a substantial factor in causing the harm that Plaintiff suffered.

68.     On information and belief, certain Defendants acted with malice, oppression , or fraud - including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example: Defendant Kilitch, Defendant Velocity, and Defendant Target  failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

**IV.**
**FOURTH CAUSE OF ACTION**
**(Negligence – against all Defendants)**

69.     Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

70.     Defendant Kilitch and Defendant Velocity are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Lubricant Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product and Defendant Velocity is an apparent distributor who packaged, labeled, marketed, advertised, supplied, distributed, and sold the product. Defendant Target marketed, advertised, distributed, and sold the product. As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use. The product was either inherently dangerous or reasonably certain, if negligently manufactured, designed, distributed, packaged, labeled, supplied, marketed, advertised, and/or sold to place life and limb in peril. It was or became contaminated with *Pseudomonas fluorescens*. Defendants were negligent in manufacturing, designing, distributing, packaging, labeling, supplying, marketing, advertising, and/or

COMPLAINT

selling the product. Defendants failed to use the amount of care in manufacturing, distributing, packaging, labeling, supplying, marketing, advertising, and/or selling the product that a reasonably carefully manufacturer, designer, distributor, packager, label, supplier, marketer, advertiser, and/or seller would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. Plaintiff was harmed, and Defendants' negligence was a substantial factor in causing that harm.

71. Defendant Kilitch and Defendant Velocity also had a duty to properly supervise, train, and monitor its agents, subcontractors, and employees who prepared the product to ensure compliance with Defendants' operating standards and to ensure compliance with all applicable regulations. Defendants failed to properly supervise, train, and monitor these agents, subcontractors, and employees and thus breached that duty. Plaintiff was harmed, and Defendants' negligence was a substantial factor in causing that harm.

72. Further, Defendant Kilitch, Defendant Velocity, and Defendant Target were required to follow the laws set forth in California's Sherman Food Drug and Cosmetics Laws. Such laws require, for example, sanitary conditions at the manufacturing facility so that eye drops will be sterile and safe. *Cal. Health & Safety Code section 110111,110105* (incorporating U.S.C. Sec. 301 *et seq.* and regulations, including but not limited to 21 C.F. R. Parts 200.50, 211 and 21 C.F.R. 820 *et seq.*). Defendant Kilitch, Defendant Velocity, and Defendant Target violated the laws and as a result Plaintiff suffered harm. Plaintiff was in the class of persons intended to be protected by the laws that Defendants failed to follow. Defendant Kilitch, Defendant Velocity, and Defendant Target's violations of the law were a substantial factor in bringing about the harm that Plaintiff suffered.

73. Plaintiff expressly disclaims that this (or any) of its causes of action are brought pursuant to federal law. Plaintiff's claims are based on California law.

74. On information and belief, Defendants acted with malice, oppression, or fraud- including, but not limited to, acting with willful and knowing disregard for the rights or safety of others: Defendant Kilitch, Defendant Velocity, and Defendant Target failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

//

## V.
## FIFTH CAUSE OF ACTION
### (Negligent Failure to Warn – against all Defendants)

75.     Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

76.     Defendant Kilitch and Defendant Velocity are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; and Defendant Velocity was an apparent manufacturer, packager, labeler, marketer, advertiser, supplier, and seller of the product. Defendant Target marketed, advertised, distributed, and sold the product. As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.

77.     Defendants owed a duty to Plaintiff to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, testing, distribution, storage, labeling, and sale of its products, including all applicable local, state, and federal health and safety regulations - as incorporated into California law. Defendants failed to conform to this duty.

78.     Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner. The product was or became contaminated with *Pseudomonas fluorescens*. Defendants knew or reasonably should have known that users would not realize the danger. Defendants failed to adequately warn of the danger or instruct on the safe use of the product. A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer, advertiser, and/or seller under the same or similar circumstances would have warned of the danger or instructed on the safe use of the product.

79.     Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others.

80.     Plaintiff was harmed. Defendants' negligent failure to warn or instruct was a substantial factor in causing the harm suffered by Plaintiff.

81.     On information and belief, Defendants acted with malice, oppression, or fraud- including, but not limited to, acting with willful and knowing disregard for the rights or safety of

17

COMPLAINT

others: Defendant Kilitch, Defendant Velocity, and Defendant Target failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

## VI.
## SIXTH CAUSE OF ACTION
### (Negligent Failure to Recall – against all Defendants)

82.    Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

83.    Defendant Kilitch and Defendant Velocity are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; and Defendant Velocity was an apparent manufacturer, packager, labeler, marketer, advertiser, supplier, and seller of the product. Defendant Target marketed, advertised, distributed, and sold the product. As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.

84.    Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner. The product was or became contaminated with *Pseudomonas fluorescens*. Given that the CDC investigation remained prior to the recall, on information and belief, Defendants became aware or should have become aware of this defect after the product was sold. Defendants failed to recall or warn of the danger of the product. A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer, advertiser, and/or seller under the same or similar circumstances would have recalled the product. Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. Plaintiff was harmed. Defendants' failure to recall the product was a substantial factor in causing the harm suffered by Plaintiff.

85.    On information and belief, certain Defendants acted with malice, oppression, or fraud- including, but not limited to, acting with willful and knowing disregard for the rights or safety of

18
COMPLAINT

others: Defendant Kilitch, Defendant Velocity, and Defendant Target failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

## VII.
### SEVENTH CAUSE OF ACTION
### (Breach of Implied Warranty – against all Defendants)

86.   Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

87.   Defendant Kilitch, Defendant Velocity, and Defendant Target are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the Target UP & UP Dry Eye Relief Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; and Defendant Velocity was an apparent manufacturer, packager, labeler, marketer, advertiser, supplier, and seller of the product. Defendant Target marketed, advertised, distributed, and sold the product. Plaintiff bought the product from these Defendants. At the time of the purchase, these Defendants were in the business of manufacturing, designing, distributing, packaging labeling, supplying, marketing, advertising, and/or selling the product or held themselves out as having special knowledge or skill regarding these goods. They warranted that the product complied with FDA regulations, was safe, effective, not adulterated with harmful bacteria, could be used so that it would not become adulterated with harmful bacteria, was prepared under sanitary conditions, and sterile. They warranted that the product was merchantable and fit for its ordinary purpose. Instead, the product was or became contaminated with harmful bacteria. Thus, the product was not of the same quality as those generally acceptable in the trade; was not fit for the ordinary purposes for which goods are used; was not adequately contained, packaged, or labeled; and did not measure up to the promises or facts stated on the container or label making the product was not merchantable. Plaintiff was harmed. The failure of the product to have the expected quality was a substantial factor in causing Plaintiff's harm.

88.   On information and belief, Defendants acted with malice, oppression, or fraud-including, but not limited to, acting with willful and knowing disregard for the rights or safety of others: Defendant Kilitch and Defendant Velocity failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in

compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

## VIII.
## EIGHTH CAUSE OF ACTION
### (Gross Negligence – against Defendants Velocity Pharma and Kilitch)

89.    Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

90.    Defendant Kilitch and Defendant Velocity are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; Defendant Velocity was an apparent manufacturer, packager, labeler, marketer, advertiser, supplier, and seller of the product. As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including, but not limited to, a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use. Defendants' conduct showed a want of even scant care, the conduct displayed an extreme departure from the ordinary standard of conduct, as an entire failure to exercise care, as the exercise of so slight a degree of care as to justify the belief that there was an indifference to the interest and welfare of others.

91.    That want of care raises a presumption of conscious indifference to the consequences, Defendants' behavior has clearly indicated a passive and indifferent attitude toward the results of the product. It was reasonably certain that the product, if negligently manufactured, designed, distributed, packaged, labeled, supplied, marketed, advertised, and/or sold to place life and limb in peril and could become contaminated with *Pseudomonas fluorescens,* or other dangerous bacteria, as it did. Defendants were grossly negligent in manufacturing, designing, distributing, packaging, labeling, supplying, marketing, advertising, and/or selling the product. Defendants failed to use the amount of care in manufacturing, distributing, packaging, labeling, supplying, marketing, advertising, and/or selling the product that a reasonably carefully manufacturer, designer, distributor, packager, label, supplier, marketer, advertiser, and/or seller would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others.

COMPLAINT

92. Plaintiff was harmed, and Defendants' negligence was a substantial factor in causing that harm. Defendants were grossly negligent, more than just ordinary carelessness, inattention, or a mistake in judgment. Defendants were aware of the potential consequences of their actions and failure to uphold reasonable standards of care towards Plaintiff and the public, they simply did not care about the results of their actions.

### IX.
### <u>NINTH CAUSE OF ACTION</u>
**(Negligent Infliction of Emotional Distress – against all Defendants)**

93. Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

94. Defendant Kilitch and Defendant Velocity are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; and Defendant Velocity was an apparent manufacturer, packager, labeler, marketer, advertiser, supplier, and seller of the product. Defendant Target marketed, advertised, distributed, and sold the product. As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.

95. Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner. The product was or became contaminated with *Pseudomonas fluorescens*. Given that the CDC investigation remained prior to the recall, on information and belief, Defendants became aware or should have become aware of this defect after the product was sold. Defendants acted willfully and maliciously in an intentional and reckless manner by manufacturing and producing a product to the Plaintiff and public that failed to uphold a reasonable standard of care and caused severe injury as a result. A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer, advertiser, and/or seller under the same or similar circumstances would not have sold the contaminated unsafe product on the market.

96. Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer,

advertiser, and/or seller under the same or similar circumstances would have reasonably foreseen that their actions, or failure to act appropriately, would cause injury and subsequent emotional distress. Plaintiff was harmed. Plaintiff was harmed both physically and emotionally, by the contaminated eye drops causing damage and injury to her body.

97.    Plaintiff has lost enjoyment of her life, lost pride in her appearance, has suffered impairment and severe pain, and a loss of comfort, which occurred as a result of the negligence, carelessness, and recklessness of Defendants as previously set forth herein. Plaintiff has lived through the consequences of that negligence, carelessness, and recklessness, including the pain and suffering, as previously set forth herein. The trauma and shock of Plaintiff's continuing experience of the gradual loss of sight and visibility and of the events previously set forth herein caused her to suffer in the past and will continue to cause her to suffer in the future severe emotional and psychological distress and injuries, all of which have manifested physically, including, but not limited to, depression, stress, anxiety, and physical and psychological ailments. Plaintiff has experienced severe emotional distress from Defendants' negligent failure to uphold a reasonable standard of care, of which they had a duty to do so.

## X.
## TENTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress – against Defendants Velocity and Kilitch)**

98.    Plaintiff alleges and re-alleges, and incorporates herein by this reference, each and every allegation contained in the proceedings paragraphs as though fully incorporated herein and made a part hereof.

99.    Defendant Kilitch and Defendant Velocity are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Target UP & UP Dry Eye Relief Eye Drops. Defendant Kilitch manufactured, designed, packaged, supplied, distributed, and sold the product; and Defendant Velocity was an apparent manufacturer, packager, labeler, marketer, advertiser, supplier, and seller of the product. As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.

100.    Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer, advertiser, and/or seller under the same or similar circumstances would have reasonably foreseen that their

22

COMPLAINT

actions, or failure to act appropriately, would cause severe emotional distress, emotional injury, and bodily harm. The Defendants breached the duty of care owed to Plaintiff as a result of Defendants' extreme and outrageous conduct, which recklessly caused Plaintiff severe emotional distress. Defendants were aware that they were not appropriately following safety guidelines and requirements implemented by the FDA, and continued to breach their duty of care owed to Plaintiff by continuing to participate in such actions and behaviors. Plaintiff was harmed. Plaintiff was harmed both physically, by the contaminated eye drops causing damage and injury to her body, as well as emotionally.

101.    Plaintiff has lost enjoyment of her life, lost pride in her appearance, has suffered impairment and severe pain, and a loss of comfort, which occurred as a result of the negligence, carelessness, and recklessness of Defendants as previously set forth herein. Plaintiff has lived through the consequences of that negligence, carelessness, and recklessness, including the pain and suffering, as previously set forth herein. As a result of the physical trauma and injury that Plaintiff has experienced as a result of Defendants' intentionally reckless behaviors, Plaintiff has subsequently experienced severe emotional trauma and injury. The trauma and shock of Plaintiff's continuing experience of the gradual loss of sight and visibility and of the events previously set forth herein caused her to suffer in the past and will continue to cause her to suffer in the future, severe emotional and psychological distress and injuries, all of which have manifested physically, including but not limited to depression, stress, anxiety, and physical and psychological ailments.

## DAMAGES

102.    Plaintiff incorporates the preceding paragraphs by reference as though set forth here in their entirety. Defendants' conduct was a direct, proximate, and producing cause of Plaintiff's injuries and damages, including but not limited to damages in the past and future, including but not limited to: pain and suffering, mental anguish, emotional distress, physical impairment, physical disfigurement, loss of enjoyment of life, medical and pharmaceutical expenses, emotional distress, lost wages, lost earning capacity, and attorneys' fees (to the extent recoverable) and other general, special, ordinary, incidental, and consequential damages as would be anticipated to arise under the circumstances. On information and belief, Defendants acted with malice, oppression, or fraud-including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example, including but not limited to, in failing to test for bacteria. Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid

those consequences.

WHEREFORE, Plaintiff prays for judgment against the Defendants, and each of them, as follows:

1. Past and future economic and non-economic damages, general and specific damages, in an amount to be determined at trial;

2. For loss of earnings and diminution of earning capacity according to proof;

3. Punitive damages;

4. For costs, disbursements and reasonable attorneys' fees to the extent allowed by law;

5. Pre- and post- judgment interest;

6. For such other and further relief as the Court deems just and proper in the circumstances.

DATED: October 23, 2024                    **LYNN & O'BRIEN, LLP**

                          By: _____
                              Elizabeth A. O'Brien, Esq.
                              Attorney for Plaintiff

24

COMPLAINT